IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

CHARLES S SCOTT,

      Plaintiff,

v.                              CASE NO. 1:08-cv-00213-MP-AK

MICHAEL J ASTRUE,

      Defendant.

_____/

## O R D E R

This action is brought pursuant to 42 U.S.C. § 405(g) of the Social Security Act

(Act) for review of a final determination of the Commissioner of Social Security (Commissioner)

denying Plaintiff's application for disability insurance benefits (DIB) under Title II of the Social

Security Act.

Upon review of the record, the Court concludes that the findings of fact and

determinations of the Commissioner are supported by substantial evidence; thus, the decision of

the Commissioner is affirmed.[1]

## A.    PROCEDURAL HISTORY

Plaintiff filed an application for DIB on October 14, 2003, alleging a disability onset date

of September 17, 2003 because of hypertension, depression, anxiety, herniated discs in his back,

and an ankle injury.  (R. 87, 137).  Plaintiff petitioned for a hearing before an administrative law

judge (ALJ), who conducted a hearing on August 28, 2006, and entered an unfavorable decision

---

[1]The Defendant's Motion for Leave to File Enlarged Memorandum (Doc. 18) is granted nunc pro tunc.

on July 25, 2007.  (R. 22-34).  The Appeals Council denied Plaintiff's request for review on

August 26, 2008, thus making the decision of the ALJ the final decision of the Commissioner.

This action followed.

## B.    FINDINGS OF THE ALJ

The ALJ found that the Plaintiff had the following severe combination of impairments:

chronic right ankle instability, lower back pain associated with degenerative disc disease,

obesity, depression and anxiety, but that this did not meet the listings.  (R. 27-28).  Despite these

impairments, the ALJ found that Plaintiff has the residual functional capacity to perform low-

stress non-production-oriented simple unskilled work requiring one-, two-, or three-step

instructions; the ability to lift or carry up to 10 pounds; sit and/or walk with normal breaks for a

total of two hours in an eight-hour workday; sit with normal breaks for a total of six hours in an

eight-hour workday; the ability to understand, remember, and carry out simple job instructions,

but unable to concentrate upon complex or detailed tasks; the ability to occasionally balance,

stoop, crouch, kneel, and crawl; should avoid pushing and pulling motions with his lower

extremities, hazards in the workplace and climbing; and requires a cane to ambulate.  (R. 28).

In making this finding, the ALJ considered the nature and extent of Plaintiff's symptoms

that were reasonably consistent with objective medical evidence and opinion evidence.  (R. 28).

Plaintiff testified to two types of impairments: physical limitations caused by arthritis,

back pain, and ankle instability and mental limitations caused by depression, general anxiety

disorder, panic disorder, and dysthymic disorder.  In addition, the ALJ found that, based upon

the testimony of a vocational expert, Plaintiff is capable of performing jobs in the national

economy of which there are significant numbers.  Therefore, Plaintiff is not disabled and can

find work performing his past relevant work.

C.     <u>**ISSUES PRESENTED**</u>

Plaintiff argues that the Commissioner erred by: (1) failing to credit a treating physician's opinion that the Plaintiff is disabled; (2) failing to credit a state agency consultant's assessment of plaintiff's residual functional capacity; (3) relying upon the vocational expert's testimony in response to an incomplete hypothetical that conflicted with the Dictionary of Occupational Titles; and (4) failing to reverse the Commissioner's decision despite new material evidence demonstrating that plaintiff's Veterans Administration (VA) disability rating increased to 100%. (Plaintiff's Br. at 1).

The government responds by arguing that the ALJ properly assessed Plaintiff's residual functional capacity to include occasional ability to stoop by considering all the relevant evidence in the record, "including objective medical evidence, the statements and observations of the claimant's medical sources, and the medical source opinions" as well as Plaintiff's testimony and daily activities. (Defendant's Br. at 24-25). Moreover, the ALJ's residual functional capacity finding that Plaintiff was able to occasionally stoop is supported by substantial evidence in the record. The ALJ properly took all relevant evidence into account, including evidence from MRIs and CTs that plaintiff's back, ankle, and knee impairments were not severe, showing only minimal abnormalities and Plaintiff's own reports to his physicians that his pain medications were effectively managing his pain and that he was doing well.

Additionally, the government argues that the Appeals Council did not "reject" the VA's August 2007 revised disability rating but rather considered Plaintiff's additional evidence along with the overall record. (Defendant's Br. at 35-36).

Finally, the government argues that even if the jobs as crystal attacher and band attacher are production-oriented jobs, which by the ALJ's findings are precluded given Plaintiff's residual functional capacity, the other two types of jobs that the vocational expert testified Plaintiff was able to perform in the national economy–call-out operator and surveillance system monitor–are not production oriented. Therefore, there exist non-production-oriented jobs in the national economy that Plaintiff is able to perform. (Defendant's Br. at 38-39).

The issue thus presented is whether the Commissioner's decision that Plaintiff is not disabled is supported by substantial evidence in the record and decided by proper legal standards.

## D.    STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) sets forth the standard of review for this court. The Commissioner's decision must be affirmed if it is supported by substantial evidence and the correct legal standards have been applied. Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997). Findings of fact by the Commissioner which are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g). Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996). "Substantial evidence" has been defined to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citation omitted) (per curiam). It is more than a scintilla, but less than a preponderance. Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted). The court may not reweigh the evidence or substitute its judgment for that of the Commissioner. Wolfe v. Chater, 86 F.3d 1072, 1076 (11th Cir. 1996). It must determine only if substantial evidence supports the findings of the Commissioner. See Bridges v. Bowen, 815

F.2d 622, 624 (11th Cir. 1987) (per curiam).  Even if substantial evidence exists which is

contrary to the Commissioner's findings, where there is substantially supportive evidence of the

Commissioner's findings, the court cannot overturn them.  Barron v. Sullivan, 924 F.2d 227, 230

(11th Cir. 1991).  Unlike the deferential review accorded to the Commissioner's findings of fact,

his conclusions of law are not presumed valid. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th

Cir. 1990) (citations omitted).  The Commissioner's failure to apply correct legal standards or to

provide the reviewing court with an adequate basis for it to determine whether proper legal

principles have been observed requires reversal.  Id. (citations omitted).

    A disability is defined as an "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or

mental impairment must be so severe that Plaintiff is not only unable to do his previous work,

"but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

    Pursuant to 20 C.F.R. § 404.1520(a)-(f), the Commissioner analyzes a claim in five steps:

1.     Is the individual currently engaged in substantial gainful activity?

2.     Does the individual have any severe impairment?

3.     Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.     Does the individual have any impairments which prevent past relevant work?

5.     Do the individual's impairments prevent any other work?

A finding of disability or no disability at any step renders further evaluation unnecessary. Plaintiff bears the burden of establishing a severe impairment that keeps him from performing his past work. If Plaintiff establishes that his impairment keeps him from his past work, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given Plaintiff's impairments, Plaintiff can perform. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, Plaintiff must prove that he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987). It is within the district court's discretion to affirm, modify, or reverse a Commissioner's final decision with or without remand. 42 U.S.C. § 405(g); Myers v. Sullivan, 916 F.2d 659, 676 (11th Cir. 1990).

**E.     SUMMARY OF PLAINTIFF'S RELEVANT MEDICAL HISTORY**

Plaintiff's chief complaints are hypertension, depression, anxiety, herniated discs in his back, and right ankle and knee problems. (R. 87, 137-38). Plaintiff sought treatment from several different physicians at the VA Medical Center. Plaintiff primarily received care for his back, ankle, and knee problems from chiropractor Dr. Todd Whitehead between November 1998 and August 2003 and Drs. Robert Paige between April 2003 through August 2003, Joshua E. Fuhrmeister in January 2004, Robert A. Greenberg in February 2004, Michael D. Menninger in April 2004, Govind P. Senjalia from April 2004 through September 2004, Carolyn Von Zabern from August 2004 through December 2006, and Lalitha Ganesh in September 2006. (R. 150-198, 199-209, 230-31, 272-274, 304-305, 312-315, 321, 351-360, 366-372, 451-452, 467-473, 535, 609-613, 729, 757-767, 995).

Dr. Von Zabern also periodically renewed Plaintiff's pain medications upon Plaintiff's request from late 2003 through December 2005.   (R. 296-297, 301-303, 309, 316-321, 361-363, 365, 379, 388, 609, 617-623).  With each medication renewal, Dr. Von Zabern noted that Plaintiff reported that his prescription pain medication was effectively controlling his pain.  In May 2006, Dr. Von Zabern completed a loan discharge application for plaintiff, writing that Plaintiff's osteoarthritis and lumbar degenerative disc disease prevented him from working and earning any money, and also signed a disabled parking permit for Plaintiff indicating that Plaintiff was unable to walk 200 feet due to a severe limitation in his ability to walk.  (R. 524).

Plaintiff received a pre-disability onset MRI of his spine in May 2002, showing degenerative spondylosis, narrowed L4-5 discs, a small spur on L4, and normal lordotic curvature (R. 149).  Later MRIs of Plaintiff's back and spine showed early degenerative disc disease at L4-5 and L5-1 and normal lordotic curvature, an "essentially normal" MRI (June 2002) (pre-onset); mild degenerative changes at L4-5 and L5-1 (April 2003) (post-onset); mild degenerative bony findings, good alignment and "[o]nly mild degenerative spurring" (October 2003) (post-onset); a mild broad-based disc bulge with normal vertebral body heights, marrow spaces, and intervertebral foramina and no canal stenois (February 2004) (post-onset).  In addition, a May 2002 (pre-onset) x-ray revealed degenerative spondylosis with narrowing L4-5 discs, a small spur on L4, and straightening of normal lordotic curvature.  (R. 149).  A March 2006 spine x-ray revealed minimal atherosclerosis, facet osteoarthritis most pronounced at L5-S1, and mild and unchanged degenerative disc disease with no sublaxation, compression fracture, or destructive lesions.  (R. 547, 567, 684).   A June 2006 EMG failed to show the cause of Plaintiff's reported back pain, but Plaintiff desired surgery at the end of August 2006.  (R.

556). In February 2007 a CT of Plaintiff's spine showed mild disc bulges at L3-4 and L4-5 with no significant thecal space or neural foraminal compromise. (R. 839). An April 2008 CT of Plaintiff's spine showed no electrodiagnostic evidence of acute lumbrosacral radiculopathy. (R. 868).

Diagnostic medical evidence involving Plaintiff's ankle includes a pre-onset June 2002 MRI showing a small amount of fluid but without any tears or disruption of the Achilles tendon; an October 2003 MRI showing no gross fracture but "[t]here may be some swelling along lateral margin of the ankle." (R. 146, 148, 367).

Diagnostic medical evidence involving Plaintiff's knee includes a February 2006 MRI showing mild subchondral sclerosis, small osteophytes, and medial joint space narrowing with no effusion or lytic bone erosive lesion. (R. 689).

Prior to his alleged disability onset, Plaintiff saw a chiropractor, Dr. Todd Whitehead, for low back pain, right leg pain, and foot pain, receiving weekly manipulations. According to Dr. Whitehead, Plaintiff responded favorably to these treatments and was functioning "rather well in his job duties and normal [activities of daily living]." (R. 154).

Also prior to his alleged disability onset, Plaintiff sought pain medication treatment from Dr. Robert Paige to alleviate his lower back pain and left leg pain. In the months Plaintiff saw Dr. Paige, Dr. Paige administered lumbar transforminal blocks on Plaintiff's L4 and L5, resulting in Plaintiff reporting he was feeling a lot better and his pain had significantly improved. (R. 200, 202-03, 207). According to Dr. Paige, Plaintiff had 5/5 strength and full range of motion in July 2003. (R. 200). Dr. Paige recommended continued medication treatment for Plaintiff's back pain and noted that Plaintiff seemed to be doing well. (R. 200).

Post-alleged onset, Plaintiff's visits to the VA for his back pain included a nurse's assessment in November 2003, in which Cynthia K. Amy, R.N. observed Plaintiff had full range of motion with no pain and a normal gait, and an emergency room visit where Plaintiff presented with complaints of low back pain possibly caused by a twisting movement but was found to have full range of motion, and normal gait without assistance. (R. 399, 390-397). Dr. Fuhrmeister examined Plaintiff in January 2004 and found osteoarthritis, lumbar radiculopathy, and possible arthropathy. (R. 371-372). In addition, Dr. Fuhrmeister consulted with the physical therapy department to fit Plaintiff for a cane because his lower back pain caused him to nearly fall occasionally. (R. 372).

In February 2004, Dr. Greenberg examined Plaintiff and reported that Plaintiff had decreased range of motion in his lumbar spine and difficulty bearing weight on his right ankle which caused him to be unable to walk without using his cane. (R. 231). He also had elevated blood pressure and was diagnosed with hypertension. (R. 232). A few months later, Plaintiff presented to Dr. Menninger, a resident at the VA, with complaints of low back pain radiating down his left leg. Dr. Menninger noted lumbar radiculopathy and probable left L4 nerve root compression and left ankle cyst, noting that Plaintiff's pain medication gave him significant relief. (R. 360).

In April and May 2004, Plaintiff presented to Dr. Senjalia with complaints of right ankle instability and pain. In May 2004, Dr. Senjalia performed ankle reconstruction, and Plaintiff reported "no problems" in his follow-up with Dr. Senjalia a few days after surgery. (R. 322-323, 351-358, 416-417, 451-452). In August 2004, Dr. Van Zabern saw Plaintiff and Plaintiff reported intermittent ankle pain that was alleviated with pain medication (Lortab), but he

requested additional recovery time before returning to work. (R. 309). An EMG performed that same day was a normal study, negative for evidence of left lumbar or sacral radiculopathy. (R. 309). In September 2004, Plaintiff returned to Dr. Senjalia, reporting that he had been doing well since ankle surgery. (R. 304). His ankle had no swelling, satisfactory range of motion, and good stability. Dr. Senjalia observed that Plaintiff could then return to duty as a prison guard since he had over three months of post-surgery recovery time. (R. 304-305).

In November 2004, Dr. Chodosh performed a physical exam of Plaintiff at the request of the state Division of Disability Determinations and noted that Plaintiff reported chronic low back pain and ankle injury stemming from a 1981 fall from a height of 15 feet, back spasms, and left sciatica. In addition, Dr. Chodosh noted that while Plantiff "tend[ed] to use a cane . . . [he] does not require its use." (R. 255). The exam also found that all Plaintiff's joints enjoyed full range of motion, no back/spine deformity, tenderness, or paraspinal back spasm, normal standing balance, normal gait, except Plaintiff indicated an inability to walk on heels or toes, or to squat. (R. 257-258). However, Dr. Chodosh's findings include that Plaintiff was "able to bend, lift, carry, squat, kneel, and crawl" as well as comprehend and follow directions. (R. 258). Dr. Chodosh also reported that there were "no significant physical findings to indicate major impairment in" Plaintiff's back or right ankle. (R. 258).

Several months later, in March 2005, Plaintiff returned to Dr. Von Zabern for pain management and reported good pain relief with Lortab. (R. 273). Dr. Von Zabern did not mention in her notes whether Plaintiff used a cane. In July 2005, Plaintiff presented to the VA urgent care center with complaints of back pain, reporting that Lortab helped, but that physical therapy had not. Plaintiff also reported that chiropractic care had helped manage his pain, but

that he had to discontinue treatment because of his finances. (R. 657). Dr. Margaret Lo, examining physician, observed that Plaintiff's gait and strength were normal. (R. 658-659). In December 2005, Plaintiff saw Dr. Von Zabern, and she observed that Plaintiff was able to walk on the balls and heels of his feet. (R. 613). Again, Dr. Von Zabern did not mention in her notes that she observed Plaintiff using a cane.

In February 2006, Plaintiff reported to the VA urgent care center with complaints of right knee pain, but his right knee was found to be non-tender without kneecap abnormalities. (R. 593). He was given a knee immobilizing brace and given an increased Hydrocodone dose for three days only. (R. 590-602). In March and June, Plaintiff saw VA nurses, complaining of knee and back pain. In September, Plaintiff saw Dr. Ganesh for a physical rehabilitation assessment. Plaintiff could walk on his heels and toes and had normal active range of movement in all of his joints, but had restricted range of movement in his spine "probably due to obesity" and walked using a cane and knee and ankle braces. (R. 804). Dr. Ganesh assessed degenerative knee joint disease and chronic lower back pain without neurological deficit. (R. 804).

In October 2006, Plaintiff presented to neurologist Dr. Hajibrahim regarding his lower back and left leg pain and numbness. Dr. Hajibrahim observed that Plaintiff had full 5/5 motor strength, but no Achilles reflex, and decreased sensation in his left foot. (R. 778). Also in October, Bruce A. Mueller completed a functional capacity evaluation at the VA finding that Plaintiff was able to work at the sedentary-light physical demand level for an eight-hour day. (R. 787). Among the detailed findings was a marked decrease in Plaintiff's range of motion while squatting, but the ability to lift with his back up to ten pounds; the ability to lift with his shoulders up to twenty pounds; the ability to lift overhead up to twenty pounds; with excellent

fine motor skills and "is qualified for Assembly Tasks of pieces in the 1-4mm range or larger at a Non Production Rate" with a capability of production rate after a short period of training; and a symptom exaggeration classification of minimal symptom exaggeration in existence (MSE). (R. 787-799).

In December, Dr. Von Zabern saw Plaintiff and opined that Plaintiff's right knee osteoarthritis may be caused by his right ankle problem. (R. 760). A few weeks later, Plaintiff enrolled in the VA's weight management program, which advised 30 to 59 minutes of moderate physical activity five days per week. (R. 734).

On January 18, 2007, at the request of the ALJ after the first hearing in August 2006, Dr. Lipnick examined Plaintiff and found bilateral paralumbar muscular rigidity with reduced range of movement in flexion, extension, side bending, and rotation; 5/5 motor strength; decreased bilateral reflexes at the knees and ankles; regionally decreased sensation left lower extremity, but normal sensation in right lower extremity; normal gait with "good heel-to-toe progression". (R. 536-538). Dr. Lipnick also observed that Plaintiff occasionally used his cane for balance. (R. 538). Dr. Lipnick also completed a range of movement report form, which indicated a functional or normal finding for all motion types at all joints, including the lumbar spine, knee and ankle. (R. 539-540). A few days after, Dr. Lipnick also completed a medical source statement of ability to do work-related activities, in which he stated that Plaintiff could lift ten pounds, stand and/or walk less than two hours and sit less than six hours in an eight-hour workday; never climb, balance, kneel, crouch, crawl or stoop; and had unlimited ability to reach, handle, feel, see, hear, speak, and tolerate extreme temperatures, noise, dust, vibration, humidity, hazards, fumes, odors, chemicals, and gases. (R. 541-545).

For his depression and anxiety, plaintiff sought assessment and treatment from Drs. C.

Brooks Henderson in December 2003 (R. 381), Jerry W. Pruitt in January 2004 (R. 374-75), and

Carlos Cuadros from February 2004 until February 2007.  (R. 363, 395, 553, 598-601, 621-622,

678-679, 949).

Plaintiff visited different VA doctors with complaints of anxiety and trouble coping.  Dr.

Henderson assessed general anxiety disorder in December 2003 and ruled out personality

disorder and also continued Plaintiff on an antidepressant (buproprion).  (R. 380-81).  In January

2004, Dr. Pruitt assessed adjustment disorder with mixed anxiety and depressed mood, ruled out

personality disorder, and assigned Plaintiff a Global Assessment of Functioning (GAF) score of

50, representing serious symptoms or impairments in social or occupational functioning.  (R.

377-78).

A few days after Dr. Pruitt's assessment, Dr. Andres Nazario performed a psychological

evaluation of Plaintiff at the request of the Office of Disability Determination.  (R. 210-13).  Dr,

Nazario reported that Plaintiff had panic disorder without agoraphobia and dysthymic disorder.

(R. 213).  Around the same time, in February 2004, state agency consultant Val J. Bee, Psy. D.

completed a psychiatric review technique form, indicating that Plaintiff had dysthymia and

recurrent severe panic attacks but that these impairments only constituted mild or no functional

limitation on activities of daily living, social functioning, and concentration, persistence and

pace.  (R. 214-226).

In February 2004, Dr. Cuadros diagnosed Plaintiff with post-traumatic stress disorder

(PTSD) and dysthmyic disorder.  Dr. Cuadros changed Plaintiff's prescription medication

treatment by discontinuing Clonazepan and Xanax and prescribing Plaintiff Wellbutrin.  (R.

363).  In December 2004, April 2005, October 2005, February 2006, June 2006, and February

2007, Plaintiff returned to Dr. Cuadros and reported that his anxiety and depression treatment

had been "beneficial" and he was feeling fair, denying medication side effects.  During each

visit, Plaintiff's mental status was alert, coherent, and negative for emotional distress or violent

ideation.

**F.**     **SUMMARY OF THE ADMINISTRATIVE HEARING**

Plaintiff was 46 years old at the time of the hearing and had completed high school in

addition to technical training in the Marine Corps, an associate's degree in automotive

technology, and a bachelor's degree in criminology.  (R. 1018, 1019, 1021, 1033).  He had

worked doing avionics in the Marine Corps for four years between 1979 and 1983 before

working as an automotive mechanic between 1987 and 1991 and as a corrections officer between

1998 and 2003.  (R. 1020-21).  He suffers from back, ankle, and knee pain.

He was injured in 1981 while serving in the Marine Corps and also injured himself in the

automotive business in 1990.  (R. 1020, 1021).  He developed back pain and stopped working in

October 2003.  (R. 1022-1023).  In 2004, he had right ankle reconstruction surgery.  (R. 1016).

He has a driver's license and drives a Chevy Silverado truck because its seat doesn't hurt

his back.  (R. 1026).  Standing for more than 10 minutes makes his pain worse.  He does some

grocery shopping, can raise his arms above his head, handle coin change, write, and read the

newspaper (R. 1027).  He is unable to bend or stoop and uses a cane.  (R. 1031).  He has trouble

sleeping and does minimal household chores.  (R. 1032).

The initial hypothetical posed to the vocational expert included the ability to lift and

carry ten pounds; stand two hours and sit six hours during an eight-hour work day; walk with a

cane; perform pushing/pulling/manual dexterity/fine manipulation for reaching and handling with his upper extremities; frequently ascend and descend stairs; occasionally balance, stoop, kneel, crouch, and crawl; should avoid pushing/pulling with lower extremities; and understand, remember, and carry out simple job instructions; and the inability to climb. (R. 1037, 1039).

The vocational expert testified that Plaintiff would be limited to a "light physical demand level at work, and also any unskilled job with the low stress, one, two, simple repetitive type of employment," which precluded Plaintiff's past relevant work as a corrections officer and auto mechanic. (R. 1037-1038). However, the expert testified, Plaintiff would be able to perform a "large number of other employment in the regional and national economy within the parameters posed" by the ALJ, including assembler of small products, which employs 30,874 jobs in the regional economy and 1,508,477 in the national economy, and electronics worker, which employs 7,928 in the regional economy and 157,119 in the national economy. (R. 1038).

The second hypothetical posed to the expert included an individual who uses a cane and has depression that affects his ability to concentrate upon complex or detailed tasks but remains capable of understanding, remembering, and carrying out simple job instructions. The expert testified that this did not change the kinds of jobs Plaintiff was capable of performing in the regional and national economies. (R. 1039).

The third hypothetical expanded upon the second and also included the limitation of working only at a sedentary level, lifting no more than ten pounds, sitting up to six hours, and standing up to two hours. The expert responded by testifying that Plaintiff would be able to perform other jobs under those parameters, including working as a call-out operator, which employs 2,804 in the regional economy and 47,453 in the national economy, or surveillance

system monitor, which employs 8,900 in the regional economy and 125,573 in the national economy, or band or crystal attacher, which employ 3,167 in the regional economy and 104,451 in the national economy.  (R. 1039-1040).

The fourth hypothetical incorporated all of the Plaintiff's symptoms, including that he lays down 40 percent of each eight-hour workday.  The expert testified that this would rule out an ability to complete a normal eight-hour workday, exceeding normal breaks.  (R. 1041).  This would not be an accommodation provided for in the workplace.

Because Plaintiff indicated during the hearing that he had back surgery scheduled in September 2006, the ALJ held a supplemental hearing on May 29, 2007.  (R. 1045).  Plaintiff testified at the second hearing that he did not have back surgery because his physician thought surgery was not necessary.  (R. 1046).  Plaintiff also testified that he wears a knee brace and developed an unrelated problem with his ear, which caused hearing loss for which he used a hearing aid.  (R. 1047).

Less than a week after the ALJ issued his decision in July 2007, the VA issued a new disability rating for Plaintiff, rating him as 100 percent disabled.  (R. 974).

## G.    <u>DISCUSSION</u>

a)    <u>Treating Physician Opinions</u>

An individual's ability to work must be assessed in light of all his impairments and any related symptoms, including pain, which is referred to as their residual functional capacity (RFC).  20 CFR §404.1545.  A person's residual functional capacity is based on the *most* they can do despite their limitations.  *Id.*  In making this determination all of a person's impairments are considered, even those which are not considered severe, and the entire record is to be

considered, even non-medical information. *Id.* The claimant is responsible for providing this evidence. *Id.* This assessment is first used at Step Four of the evaluation process. If the ALJ determines that a claimant cannot do his past relevant work, then the same RFC will be used at Step Five in conjunction with the Guidelines to decide if the person can make an adjustment to other work in the national economy.

In an ALJ's RFC assessment, he or she is to consider all of the relevant evidence. If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). Nevertheless, the ALJ may discount the treating physician's opinion if good cause exists to do so. Hillsman v. Bowen, 804 F.2d 1179, 1181 (11th Cir. 1986).

Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's] own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence." Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991), (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)). If an ALJ rejects a treating physician's opinion, he must give explicit, adequate reasons for so doing, and failure to do so results in the opinion being deemed accepted as true as a matter of law. MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992).

In finding that Plaintiff had the RFC to perform low-stress non-production-oriented simple unskilled work requiring one-, two-, or three-step instructions, the ALJ considered all symptoms and the extent to which they are consistent with objective medical evidence and all other evidence, including treating physician opinions. (R. 28). MRIs of Plaintiff's right ankle, knee, and spine showed only mild abnormalities. MRIs of Plaintiff's spine indicate normal lumbar lordotic curve and essentially normal findings or findings demonstrating mild degenerative changes, non-compressive bulging, but no stenosis. (R. 228, 547, 567, 684). MRIs of Plaintiff's knee show only mild sclerosis with a small amount of fluid, and small osteophytes, but no lytic bone erosive lesion, and intact and normal ligaments. (R. 576-578, 656-689). An April 2006 EMG of Plaintiff's lower extremities was also negative for neuropathy or radiculopathy and revealed normal bilateral motor, sensory, and motor nerve studies. (R. 556, 569).

Plaintiff's treating physicians' opinions indicate that Plaintiff's range of motion, strength, sensation, and balance are within normal limits. His strength and motor skills were normal at exams before and after his alleged disability onset. (R. 257-258, 304, 399, 658-659, 613, 778, 804). A September 2006 exam, after the initial ALJ hearing, by Plaintiff's treating physician, Dr. Ganesh, indicated that Plaintiff had good balance, normal strength, and active range of motion in his extremities. (R. 804). He could also walk on his heels and toes.

A treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory. <u>Crawford v. Comm. of Social Security</u>, 363 F.3d 1155, 1159 (11th Cir. 2004). Dr. Von Zabern's completion of a loan discharge application and disabled parking permit for Plaintiff are unaccompanied by objective medical evidence and the

judgments rendered in those documents as to Plaintiff's conditions are conclusory and contradictory to her treatment notes. Dr. Von Zabern's notes indicate that Plaintiff consistently reported to her that his medications were effectively controlling his pain and, in December 2005, Plaintiff was able to walk on the balls and heels of his feet. (R. 613).

Thus, the ALJ properly considered all the treating physician opinions, as well as all other relevant evidence, and articulated good cause for discounting those opinions expressed by Dr. Von Zabern in the documents referenced.

  b)    <u>Examining Consulting Physicians</u>

The ALJ must clearly articulate the reasons for giving less weight to the opinion of any treating physician, including a consulting physician, and the failure to do so is reversible error. <u>See</u> <u>MacGregor</u>, 786 F.2d at 1053. Where a physician has treated a claimant only on one occasion, the ALJ is to give less weight to his or her treating opinion. <u>See</u> <u>Gibson v. Heckler</u>, 779 F.2d 619, 623 (11th Cir. 1986) (noting that rule giving great weight to physician's opinion does not apply where physician has only examined patient one time). 20 CFR §§ 404.1527(d(2)(I), 416.927(d)(2)(I) provides:

> Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non-treating source.

The ALJ clearly articulated that he did not give significant weight to Dr. Lipnick's conclusion that Plaintiff would never be able to do work-related activities because that opinion

conflicted with his own reported findings and observations and also was inconsistent with the

rest of the objective medical evidence.  (R. 32).  Therefore, Dr. Lipnick's opinions need not be

afforded great weight under the treating physician's rule, and the ALJ properly considered Dr.

Lipnick's report and opinion in assessing Plaintiff's RFC.

c)     <u>Vocational Expert</u>

At the fifth step of the evaluation process, the ALJ must determine whether a Claimant,

based on his residual functional capacity, age, education and work experience, can adjust to

other work in the national economy.  20 C.F.R. § 404.1520(a)(4).  The ALJ may make this

determination by reliance upon the Medical Vocational Guidelines or by utilizing the services of

a vocational expert.  <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1239 (11th Cir. 2004).  The ALJ is not

required to include findings in the hypothetical that the ALJ has found to be unsupported.

<u>Crawford v. Comm. of Social Security</u>, 363 F.3d 1155, 1161 (11th Cir. 2004).

If the vocational expert's testimony conflicts with the DOT, then the expert's opinion

"trumps" the DOT.  <u>Jones v. Apfel</u>, 190 F.3d 1224, 1229 (11th Cir. 1999).  The Code of Federal

Regulations indicates that the DOT is not dispositive.  20 C.F.R. § 404.1566(d).  The SSA states

that "various governmental and other publications" will be consulted to determine whether

unskilled, sedentary, light, or medium jobs exist in the national economy. <u>Id.</u>

The expert's task, therefore, is to determine whether there are jobs in the region which the

claimant can perform with his precise disabilities or limitations.  If the expert can accomplish

this task, then the DOT does not control.  <u>See</u> <u>Montgomery v. Chater</u>,

69 F.3d 273, 277 (8th Cir. 1995); 20 C.F.R. § 404.1566(d).  Accordingly, the ALJ was entitled to

rely upon the vocational expert's opinion that Plaintiff was capable of performing jobs that exist

in significant numbers in the national economy.

Although the ALJ did not include the phrase "non-production oriented" in his hypothetical to the vocational expert, this does not mean that the hypothetical failed to incorporate all of the ALJ's findings regarding Plaintiff's impairments and limitations. The ALJ included in his hypothetical an ability to perform simple unskilled repetitive work and fine manipulation with handling and reaching, which is parallel with his findings. The mere fact that band and crystal attachers "produce" a product does not solely define the nature of the work in performing those jobs. In fact, as Mr. Mueller observed in his October 2006 functional capacity evaluation of Plaintiff, Plaintiff was "qualified for Assembly tasks of pieces in the 1-4mm range or larger at a Non Production Rate" with the capability of performing at production rate after a short period of training. (R. 794). As the vocational expert testified, these are both light exertional, SVP 2 positions that involve repetitive hand movements but are conducted while sitting down, all of which is consistent with the ALJ's RFC finding.

Even if ALJ's RFC finding is inconsistent with the Plaintiff's ability to perform the jobs of band or crystal attacher, the vocational expert also testified that given the ALJ's hypotheticals, Plaintiff could perform the jobs of call-out operator and surveillance system monitor, neither of which connote any type of production quality. Because the expert testified that simple unskilled repetitive employment is defined in terms of a job's SVP, and the ALJ specifically found Plaintiff capable of performing simple unskilled repetitive work, the ALJ properly relied upon the vocational expert's testimony at step five to find that Plaintiff is capable of performing the jobs of call-out operator and surveillance monitor.

d)      <u>VA's Revised Disability Rating</u>

Because the VA's revised disability rating occurred after the ALJ's July 2007 decision, Plaintiff submitted the VA's new rating to the Appeals Council for its review. The Appeals Council denied Plaintiff's request for review on the grounds that the ALJ's decision continued to be supported by substantial evidence even upon considering the VA's revised disability rating. (R. 7-8).

The Appeals Council considered the new and material evidence presented by the revised VA disability rating of Plaintiff but denied review because, even in the light of the new rating, the Appeals Council found no error in the opinion of the administrative law judge since the decision was still based on substantial evidence in the record. In addition, as the Code of Federal Regulations states, a decision by any other agency regarding a claimant's disability status is not binding on the Social Security Administration's determination of claimant's disability. 20 C.F.R. § 404.1504. The ALJ or Appeals Council is only required to consider the revised VA disability rating along with the rest of the entire record, not give it inordinate weight compared with other evidence. Thus, Plaintiff's argument that the Appeals Council erroneously failed to remand his case is without merit.

Accordingly, the Appeals Council properly evaluated the VA disability rating and determined that ALJ's decision remained supported by substantial evidence. Additionally, the ALJ properly applied the vocational expert's testimony to find Plaintiff is able to perform jobs

that exist in significant numbers in the national economy that Plaintiff can perform.  Therefore,

Plaintiff is not disabled.

Accordingly, it is

**ORDERED AND ADJUDGED:**

1.      The Defendant's Motion for Leave to File Enlarged Memorandum (Doc. 18) is
        granted nunc pro tunc.

2.      That the decision of the Commissioner denying benefits is **AFFIRMED**.

**DONE AND ORDERED** this  *10th*  day of March, 2010


            *s/Maurice M. Paul*
Maurice M. Paul, Senior District Judge